UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLETTA REED,

                          Plaintiff,

v.

CITY OF DETROIT, et al.,

                          Defendants.

_____/

Case No. 2:20-cv-11960

HONORABLE STEPHEN J. MURPHY, III

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## THE SUMMARY JUDGMENT MOTIONS [53; 54]

Plaintiff Charletta Reed sued the City of Detroit, its police department, and its former Sergeant Ronald Gibson under 42 U.S.C. § 1983 for several constitutional violations. ECF 41. Plaintiff asserted that Gibson violated her Fourth Amendment right against unreasonable seizure and excessive force, *id.* at 392–94, and her Fourteenth Amendment rights of equal protection and bodily integrity. *Id.* at 394–96.; *see also* ECF 36, PgID 373. She also asserted a § 1983 claim against the City based on *Monell* liability. ECF 41, PgID 396. And last, she asserted state law claims under the Elliot-Larsen Civil Rights Act against all Defendants.

After reviewing the briefs, the Court need not hold a hearing. *See* E.D. Mich. L.R. 7.1(f)(2). For the following reasons, the Court will grant in part and deny in part the summary judgment motions.

1

## BACKGROUND

Plaintiff called the Detroit Police Dispatch shortly after midnight on December 26. ECF 54-1, PgID 770, 1046. Plaintiff was reporting a domestic disturbance involving the father of her child. *Id.* at 770.

Gibson routinely worked the graveyard shift for the Detroit Police Department, and he responded to Plaintiff's house around one in the morning. *Id.* at 771; ECF 58-2, PgID 1595–96. Plaintiff explained to Gibson the events that led to her domestic disturbance call while the two stood in her living room. ECF 58-4 at 1:40.[1] Plaintiff then told Gibson that she had ended up on probation and explained how it happened. *Id.* at 3:30-3:50. A few minutes later, Gibson radioed to the officer in a patrol car waiting outside Plaintiff's house and "released" the officer. *Id.* at 7:40–8:14.

Gibson then returned to the living room, sat down on the couch, and continued the conversation. *Id.* at 8:30. Plaintiff informed Gibson that another person had a personal protective order against her and clarified that she was not making a complaint based on the events from earlier that night. *Id.* at 10:00–10:28.

The conversation transitioned to the personal protective orders against Plaintiff. *Id.* at 10:45–11:10. Gibson later asked, "what can the Detroit Police Department do for you because you are getting screwed." *Id.* at 15:30–15:40. Gibson also told Plaintiff that the officers should have handled their past interactions better when they responded to her earlier complaints. *Id.* at 20:35–21:20. But, according to

---

[1] The exhibit is body camera video from Gibson. It was filed in the traditional manner.

Gibson, Plaintiff's issues about the protective orders were not "a police [issue]." *Id.* at 22:37–22:45.

Gibson proposed a plan for the protective orders. Gibson would conduct a database search on Plaintiff and all other persons involved in the recent incident and the protective orders to see if any person had an outstanding arrest warrant. *Id.* at 27:45–29:10. If Gibson were to find any warrants, then he would tell Plaintiff so that she can call the probation department. *Id.* Gibson also informed Plaintiff that he would help Plaintiff with her probation and criminal history issues. *Id.* at 31:00–34:17.

Toward the end of the talk, Gibson gave Plaintiff his business card and personal cell phone number and told her to call him any time. *Id.* at 44:00–44:45. Before Gibson left the house, he shook hands with Plaintiff and walked to the door. *Id.* at 46:15–46:25. But, when Gibson was at the door, he turned around to see Plaintiff crying, and so he gave her a short hug. *Id.* at 47:35–47:45.

Plaintiff claimed in her deposition that the hug was unprofessional, but she also said that the hug was appropriate and not wrong. ECF 54-1, PgID 772. Still, Plaintiff alleged that, during the hug, Gibson said he could see why Arthur—the father of her child who she reported for the domestic disturbance—was "going crazy over [her]." *Id.* at 767, 772. Yet the body camera video shows that Gibson did not make such a comment. *See* ECF 58-4 at 47:35–47:45.

Gibson then left the house. *Id.* at 48:45. According to Plaintiff, Gibson did not make a sexual pass at her that night. ECF 54-1, PgID 772.

3

While Gibson was still on duty that night, he searched for active warrants on the persons in question and found several against Plaintiff for misdemeanors. ECF 58-2, PgID 1597–98.[2] After Gibson's shift had ended, he called Plaintiff from his home to tell her about her warrants. *Id.* at 1601. During the call, Gibson informed Plaintiff that he would help her resolve the warrants. *Id.*; *see* ECF 54-1, PgID 767, 829.

Later that day, the two exchanged text messages. ECF 54-1, PgID 837. In one message, Plaintiff sent Gibson photos of herself in her dancing outfit. *Id.* Because Plaintiff is a topless dancer, *id.* at 834, the photo she sent to Gibson was of her wearing a bra and a piece of thong underwear, *id.* at 837; *see also* ECF 58-2, PgID 1628. Afterward, Gibson went back to Plaintiff's house and the two began a sexual relationship that lasted for several weeks. ECF 54-1, PgID 767, 784.

Gibson and Plaintiff disagree on many details about the relationship. That said, the two agree that Gibson would come over to Plaintiff's house during his graveyard shift. ECF 54-1, PgID 782, 785 (explaining that Gibson was always in his uniform), 789 (explaining that Gibson came over twice during the daytime in his personal clothing and car); ECF 58-2, PgID 1602.[3] The two also agree that they had a sexual relationship; but they disagree about what sexual acts they performed together. *Compare* ECF 54-1, PgID 784, 786–87, 789–90, 842, *with* ECF 58-2, PgID 1603, 1605–06. And the two agree that they saw each other more than ten times; each

---

[2] Gibson did not record the warrant checks in his activity log. ECF 58-2, PgID 1598.
[3] Gibson did not record these trips in his activity log. ECF 58-2, PgID 1602, 1608; *see also* ECF 54-1, PgID 953.

time Plaintiff had invited Gibson to come over to her house. ECF 54-1, PgID 782; ECF 58-2, PgID 1637.

During their relationship, the two texted and called each other extensively.[4] *See generally* ECF 54-1, PgID 954–82;[5] 1006-23. On January 8, Plaintiff texted Gibson that she "fe[lt] victimized" and offered him an ultimatum: "Its two options left here… Either u are my husband OR I am the victim of sexual assault." *Id.* at 954–55. The next day she texted Gibson that she felt "lonely," and that she "don't like fighting." *Id.* at 955–96. A day later Plaintiff told Gibson that she "miss[ed] [Gibson] a lot" and that she felt "neglected." *Id.* at 957. Over the next few months, Plaintiff told Gibson that she loved him, *id.* at 961, 967, 976, called him "honey" and "bae," *id.* at 963–64, 967–68, asked for advice, *id.* at 963–64, and argued with him, *id.* at 968–69.

While the two saw each other, Gibson loaned Plaintiff money, ECF 54-1, PgID 839; ECF 58-2, PgID 1628, and Gibson took Plaintiff and her children to McDonald's when he was off duty. ECF 58-2, PgID 1605, 1630. Still, at one point Plaintiff pressured Gibson to retire and threatened to report him to a supervisor. ECF 54-1, PgID 840; ECF 58-2, PgID 1606–07.

---

[4] Plaintiff, for example, texted Gibson more than fifty times on New Year's Eve. ECF 54-1, PgID 1007–09.

[5] No party raised an inadmissibility argument for the text message transcriptions in the internal affairs memorandum, ECF 54-1, PgID 951–97. To be sure, both parties cited the text messages in their briefs. At any rate, many texts are reproduced in another, harder to read, exhibit in Gibson's summary judgment motion. *Id.* at 1006–23.

When Valentine's Day arrived, Gibson forgot about the holiday. ECF 58-2, PgID 1632. The next day, their relationship ended, and Plaintiff texted him:

> U have ruined my entire life . . . U jumped right in pussy hounding like everyone else. The least u could've done was help ME get my dance license so I wouldn't have to depend on anyone. U wanna see me down. That's why u not trying to help me. U about to get in trouble.

ECF 54-1, PgID 980; *see also id.* at 893 (Plaintiff stating that her and Gibson's "situation" lasted until February). Plaintiff reported Gibson to the Police Department's Internal Affairs that day. *Id.* at 981; *see also id.* at 1025.

In the end, Gibson retired as a police officer, ECF 53-11, PgID 708, after the Department informed him that he would be fired based on willfully falsifying his activity logs, *id.* at 705. The Wayne County Prosecutor's Office declined to prosecute Gibson for sexual assault because Plaintiff failed to provide a statement. ECF 53-10.

In Plaintiff's deposition, she alleged that Gibson sexually assaulted her. ECF 54-1, PgID 767–69, 786.[6] But Plaintiff also noted that Gibson had "no intention[] on taking [her] to jail for [an] outstanding warrant. Instead he used that as leverage to kind of gain control over [her], to manipulate [her] sexually for his own satisfaction." *Id.* at 767; *see also id.* at 783 (recalling that Gibson told her "you're not going to go to jail, not going to do that, I'm not going to lock you up. I'm not going to do none of that stuff."), *id.* at 829. Yet Plaintiff never explained what specific acts or statements Gibson took to "gain control over" and "manipulate" her. *See id.* at 767. And Plaintiff noted that Gibson did not threaten her if she did not comply with the sexual requests.

---

[6] Plaintiff, however, seemed to contradict herself when she explained that she had never been raped or sexually assaulted, except as a child. ECF 54-1, PgID 841–42.

6

*Id.* at 894. What is more, Plaintiff confirmed that Gibson neither detained her nor kept her from leaving her house. *Id.* at 836.

In Gibson's deposition, he conceded that his union's rules prevented his relationship with Plaintiff, but he did not believe the relationship flouted the Police Department's policy. ECF 58-2, PgID 1605, 1633. Instead, Gibson stressed that he had nothing to do with any investigation or case; he merely moved information to Plaintiff and would advocate for her as a friend. *Id.* at 1606; *see also id.* at 1624–25 (Gibson explaining he had no intention to influence officials to resolve Plaintiff's warrants). Gibson, for example, could not help Plaintiff with a shoplifting warrant, but he offered to give her a ride to help resolve it. *Id.* at 1625. Gibson also gave her a ride to a personal protection order hearing, *id.* at 1630–31, and he pointed out that he did not have to help Plaintiff resolve her warrants under the Police Department's policies. *Id.* at 1626, 1629. And last, Gibson confirmed that he never threatened Plaintiff or her family if she did not do a sexual act with him. *Id.* at 1636–37.

## LEGAL STANDARD

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party must identify specific portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not simply rest on the pleadings but must present "specific facts showing that there is a genuine issue for

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When resolving a motion for summary judgment, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the non-moving party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citations omitted).

## DISCUSSION

The Court will first address the claims against Gibson. After, the Court will address the claims against the City and its police department.

I.   Section 1983 Claims Against Gibson

As explained earlier, Plaintiff asserted three § 1983 claims against Gibson. The excessive force and unreasonable seizure violations hinge on Gibson allegedly forcing her to do sexual acts "under threat of formal arrest." ECF 41, PgID 393. The bodily integrity and equal protection violations also hinge on Gibson allegedly coercing Plaintiff to engage in sexual acts. *Id.* at 395; *see also* ECF 58, PgID 1473 (explaining that the equal protection claim is based on Gibson "coerc[ing] Plaintiff into unwanted sexual activities"). At bottom, the § 1983 claims rely on Gibson forcing Plaintiff to have a sexual relationship with him.

8

To establish a § 1983 claim, Plaintiff must prove "that (1) a person, (2) acting under color of state law, (3) deprived [him] of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001) (citation omitted). Gibson claimed that he was not acting under the color of state law and so all the § 1983 claims fail. ECF 54, PgID 738–42. Gibson also asserted a qualified immunity defense for all the federal claims against him. *Id.* at 742–43. The Court will grant summary judgment to Gibson on the § 1983 claims because there is no genuine dispute of material fact that he was not acting under the color of state law when he allegedly violated her federal rights. *See Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002) (stating that whether a government official acted under the color of state law is a legal issue).

Conduct occurs under color of state law when "the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law." *Kalvitz v. City of Cleveland*, 763 F. App'x 490, 496 (6th Cir. 2019) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001)). "Courts must consider the totality of the circumstance in determining whether an officer was acting under color of law at the time of the alleged constitutional violation." *Morris v. City of Detroit*, 789 F. App'x 516, 518 (6th Cir. 2019) (citing *Neuens*, 303 F.3d at 671). "The fact that a police officer is on or off duty, or in or out of uniform is not controlling. It is the nature of the act performed . . . which determines whether the officer has acted under color of law." *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (cleaned up). For that reason,

"[a]cts of police officers in the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983." *Id.* (citations omitted).

As the Sixth Circuit put it, "a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Waters*, 242 F.3d at 359 (citations omitted). Thus, "if the challenged conduct is not related in some meaningful way [] to the actor's governmental status or to the performance of his duties," then the act was not under the color of state law. *Id.* (citation omitted). Here, even if Gibson were to force Plaintiff to have a sexual relationship with him, his conduct would not occur under the color of state law for three reasons.

First, the only time that Gibson went to Plaintiff's house on official police business was the first night—December 26—in response to the domestic disturbance call. ECF 54-1, PgID 770–71; ECF 58-2, PgID 1597. Plaintiff admitted that Gibson made no sexual pass that night. ECF 54-1, PgID 772. It follows that no sexual act occurred when Gibson went to her house on official police business.

Second, all the other alleged sexual acts occurred outside Gibson's official police business. Admittedly, Gibson was on duty and in his uniform when the alleged sexual acts occurred. *Id.* at 782, 785, 789; ECF 58-2, PgID 1602. But merely being on duty and in uniform is not enough to create a genuine issue about whether Gibson, while under the color of state law, forced Plaintiff to do sexual acts with him. *Stengel*, 522 F.2d at 441. Without more, no genuine issue exists about whether the alleged sexual acts related to Gibson's official police duties.

As the body camera video showed, Plaintiff made no complaint about the domestic disturbance on December 26. ECF 58-4 at 10:00–10:28. Gibson's official police duty to Plaintiff—to respond to her domestic disturbance call—thus ended after he left her house that night. Gibson's warrant search and later call to Plaintiff about her outstanding warrants were unrelated to his official police duties. For one, without a complaint from Plaintiff, the Police Department had no policy for Gibson to follow up on the warrants. ECF 58-2, PgID 1626, 1629. For another, after discovering the warrants, Gibson neither had the desire to arrest Plaintiff nor to influence officials to resolve the warrants. *Id.* at 1625, 1636–37. And Gibson's visits to Plaintiff's house always began by her invitation. ECF 54-1, PgID 782; ECF 58-2, PgID 1637. After all, if Gibson were on official police business, then Gibson could show up uninvited to Plaintiff's house. In short, Gibson went over to Plaintiff's house to pursue his purely private interests—not police interests. *See Stengel*, 522 F.2d at 441.

The Sixth Circuit has held that a police officer who used her state-issued firearm while collecting a "personal debt" did not act under the color of state law when she used the firearm for two reasons. *Morris*, 789 F. App'x at 518. First, the officer "did not purport to be conducting police-related business." *Id.* And second, she did not "attempt to use her status as a police officer advantageously during the altercation." *Id.* Like *Morris*, although Gibson wore his state-issued uniform and used his state-issued patrol car to arrive at Plaintiff's house, Gibson never went there on police-related business except for the first night when no sexual act occurred.

That said, at least one lower court has found that there was enough evidence to show police officers had acted under the color of state law while they allegedly sexually assaulted a woman on duty. *Linthicum v. Johnson*, No. 1:02-cv-480, 2006 WL 1489616, at *27 (S.D. Ohio May 26, 2006). The plaintiff in *Linthicum* had no preexisting relationship with the officers, and thus it was "far more likely that [she] would have not trusted [them] to escort her home had she not recognized them as police officers, understood courtesy rides to be within the scope of their authority, and placed some faith in those beliefs." *Id.* But Gibson's conduct is a far cry from the officers' conduct in *Linthicum*. To compare, Gibson and Plaintiff had started a friendship; the two conversed over phone and text—including the receipt of a racy picture Plaintiff sent to Gibson—before the alleged sexual acts began. ECF 54-1, PgID 837, 1006; ECF 58-2, PgID 1605; 1632. And Plaintiff never explained that she believed Gibson had to help her with the warrants as part of his police duties. In sum, Gibson was not acting under his official police duty when the alleged sexual acts occurred.

Third, Gibson's status as a police officer was unrelated to whether he forced Plaintiff to do sexual acts with him. Plaintiff conceded that Gibson neither threatened to arrest her based on the outstanding warrants nor take any other police action against her. ECF 54-1, PgID 767, 836, 894. At most, Gibson exploited his friendship with Plaintiff—not his authority as a police officer—to allegedly force her into a sexual relationship. *See Mooneyhan v. Hawkins*, 129 F.3d 1264 (table), 1997 WL 685423, at *5 (6th Cir. 1997) (holding that a police officer who exploited a friendship

12

to rape a plaintiff did not act under the color of state law because he did not use his position of authority to do so). Gibson used his prior knowledge of the system and acted as a friend who would help Plaintiff resolve her warrant issues—conduct that is "functionally equivalent to that of any private citizen." *Redding v. St. Eward*, 241 F.3d 530, 533 (6th Cir. 2001) (quotation omitted); *see* ECF 58-2, PgID 1606, 1625; ECF 58-4 at 31:00–34:17. And the actions that Gibson offered to Plaintiff included only telling her that she had warrants and offering to drive her to the courthouse so that she could resolve warrants. ECF 58-2, PgID 1606, 1624–26. To that end, Plaintiff claimed that Gibson did not help her—let alone use his police authority to help her— with the probation issues or outstanding warrants. ECF 54-1, PgID 769. To be sure, Plaintiff's breakup text sent to Gibson conceded that he was using her "*like everyone else*"—not threatening to use his unique police power against her. ECF 54-1, PgID 980 (emphasis added). And even though Gibson's official police duties introduced him to Plaintiff, he did not act under the color of state law when the alleged sexual acts occurred because he acted "wholly independent of his official duties." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1306–07 (11th Cir. 2001) (collecting cases).

All told, Gibson's case is even more clear cut than another Sixth Circuit case that held public officials were not acting under the color of state law despite *threatening* to sue plaintiffs. *Meadows v. Enyeart*, 627 F. App'x 496, 501 (6th Cir. 2015) (holding that county officials who sent cease-and-desist letters to the plaintiffs "did not act out of a state-imposed duty. Rather, they were motivated to safeguard their personal reputations."). Here, Plaintiff explained that Gibson never threatened

13

her let alone threatened to use his police authority against her. ECF 54-1, PgID 767, 836, 894. Even if Gibson were to force Plaintiff into a sexual relationship with him while "on duty and in uniform," no evidence shows that Gibson intended to act in his official capacity or that he coerced Plaintiff to have sex with him based on his authority. *Burris v. Thorpe*, 166 F. App'x 799, 802–03 (6th Cir. 2006); *see Kalvitz*, 763 F. App'x at 496 (focusing on officer intent). For those three reasons, no genuine issue of material fact shows that Gibson acted under the color of state law when the alleged sexual acts occurred.[7]

Last, Plaintiff's bare-bones arguments that Gibson acted under the color of state law lack support from the case law. *See* ECF 58, PgID 1473. As the Court already explained, Plaintiff conceded that Gibson never exploited his power as a police officer to arrest her based on an outstanding warrant and thus he never coerced or threatened Plaintiff to engage in sexual acts. In the end, Plaintiff's § 1983 claims against Gibson fail to show he acted under the color of state law and the Court will therefore grant summary judgment to Gibson.

II.   <u>*Monell* Claim Against the City of Detroit</u>

In brief, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing

---

[7] This order is not to say that the Court approves of or finds Gibson's conduct to be appropriate for any police officer. Starting a sexual relationship after a police dispatch call—like the call here—is unprofessional. But Gibson's alleged conduct is largely a matter that the police department's internal affairs and disciplinary systems should handle. For good or bad, the conduct is simply not actionable under § 1983 because no genuine issue of material fact exists over whether Gibson acted under the color of state law.

14

*Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000)). Because no material fact shows that Gibson committed an underlying constitutional violation under the color of state law, the Court must dismiss the *Monell* claims against the City.

III.   <u>State Law Claims</u>

The Court has to date exercised supplemental jurisdiction over the three state law claims. ECF 41, PgID 384, 396–98. A district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). District courts should generally decline to exercise supplemental jurisdiction over state law claims when all federal law claims have been dismissed from the case before trial. *See Brown v. Cassens Transp. Co.*, 546 F.3d 347, 363 (6th Cir. 2008) ("[A] federal court should typically decline to exercise pendent jurisdiction over a plaintiff's state-law claims after dismissing the plaintiff's federal claims.").

The Court will decline to exercise supplemental jurisdiction over the remaining state law claims. First, the Court lacks original jurisdiction over the claims. And second, judicial economy and fairness to the litigants do not require the Court to hold onto a case that is less than two years old. The Court will therefore dismiss the state law claims without prejudice. Because the Court is declining to resolve the state law claims on the merits, the Court will deny the summary judgment motions on the state law claims.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the motions for summary judgment [53; 54] are **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the § 1983 claims against Gibson and the City of Detroit are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the state law claims against Defendants are **DISMISSED WITHOUT PREJUDICE**.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: February 17, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 17, 2022, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager

16